IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

F I L E D

JAN - 7 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| DC ENERGY MANAGEMENT, L.P.<br>8065 Leesburg Pike<br>Fifth Floor<br>Vienna, Virginia 22182<br><br>and<br><br>DC ENERGY HOLDINGS, LLC.<br>8065 Leesburg Pike<br>Fifth Floor<br>Vienna, Virginia 22182<br><br><br>Plaintiffs,<br><br>vs.<br><br>JASON MILLER,<br>3121 Buffalo Speedway<br>Apartment 2101<br>Houston, Texas 77098<br><br>Defendant. | CIVIL ACTION NO. 1:14cv15<br>GBL/IDD |

## COMPLAINT

Plaintiffs DC Energy Management, L.P. ("DCE Management") and DC Energy

Holdings, LLC ("DCE Holdings" and, together with DCE Management, "DC Energy" or

"Plaintiffs"), bring this action against former employee Jason Miller ("Mr. Miller" or

"Defendant") and allege as follows:

### NATURE OF THE ACTION

1.        This is an action to enforce Mr. Miller's Confidentiality, Non-Solicitation

and Non-Compete Agreement ("the Agreement") containing non-disclosure and

narrowly-tailored non-competition clauses agreed to by the parties when Mr. Miller became employed by DC Energy and to protect DC Energy from the continued unlawful misappropriation of its trade secrets in violation of the Agreement and Virginia Uniform Trade Secrets Act.

2.        After more than five years of work at DC Energy during which Mr. Miller learned the company's confidential trading techniques and strategies within the energy trading business, Mr. Miller left DC Energy and became employed by Saracen Energy on whose behalf he is competing against DC Energy in clear violation of the Agreement. Moreover, while at Saracen Energy, Mr. Miller has and continues to misappropriate DC Energy's confidential trading techniques and methods, among other proprietary information, in violation of the Agreement and Virginia Uniform Trade Secrets Act.

3.        DC Energy seeks preliminary and permanent injunctive relief enforcing the clear terms of the non-competition and non-disclosure covenants to which Mr. Miller agreed, and compensatory and punitive damages for the harm caused by Mr. Miller's improper competitive activity and misappropriation of trade secrets.

## THE PARTIES

4.        Plaintiff DC Energy Holdings, LLC ("DCE Holdings") currently is, and at all relevant times mentioned was, a limited liability company formed and organized under the laws of Delaware.  DCE Holdings is the parent company of DC Energy, LLC and various related trading entities and affiliates.  DCE Holdings' principal place of business is in Vienna, Virginia.  None of DCE Holdings' members are citizens of Texas.

5.        Plaintiff DC Energy Management, L.P. ("DCE Management") currently is, and at all relevant times was, a limited partnership formed and organized under the laws

of Delaware.  DCE Management is the non-member manager and operator of DCE

Holdings, with which it has a services agreement.  DCE Management's principal place of

business is in Vienna, Virginia.  None of DCE Management's general and limited

partners are citizens of Texas.

     6.     Mr. Miller is a citizen of Texas who currently resides at 3121 Buffalo

Speedway, Apartment 2101, Houston, Texas 77098.  DC Energy employed Mr. Miller

from approximately September 5, 2007 to January 31, 2013.

## JURISDICTION AND VENUE

     7.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C.

§1332(a) in that Plaintiffs and Defendant are citizens of different states and the matter in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

     8.     This district is a proper venue for this action pursuant to 28 U.S.C. §§

1391(b)(1) and (2) because a substantial part of the events or omissions giving rise to this

claim occurred in this district.  This action is properly instituted in the Alexandria

Division of this Court pursuant to Local Rule 3(C).

     9.     In addition, Defendant consented in Section 8 of the Agreement to the

exercise of personal jurisdiction over him and to venue in the state or federal court whose

jurisdiction includes Fairfax County, Virginia.

## FACTUAL BACKGROUND

     10.     DC Energy, directly or through its related companies, is a trader in the

U.S. commodity markets, with a particular focus and expertise in the energy sector.

These trades occur both "over the counter" and in various organized exchanges and

markets in products related to electricity, natural gas, and other related commodities.

11.     DC Energy has attained and maintained an especially strong competitive position over the past ten years in the more narrowly-defined "congestion market" within the broader electricity market.  The congestion market relates to especially complex derivatives that derive their value from the difference in the price of electricity between two locations and represents the value of the capacity of the transmission grid to deliver power between the two locations.  DC Energy and related companies are among the leading traders in the "congestion market" through the trading of financial transmission rights ("FTRs"), which are also known as transmission congestion contracts ("TCCs") or congestion revenue rights ("CRRs").  DC Energy trades FTRs in both organized markets, known as regional transmission organizations ("RTOs"), and through trading over-the-counter and exchange-traded products.  The trading of these types of products requires very specialized knowledge that is developed and built over time.  Only a few companies have developed the specialized knowledge necessary to successfully trade in these products.

12.     DC Energy invested, and continues to invest, substantial resources to mine and compile data and other information needed to analyze and draw coherent conclusions regarding the fundamental economics for each segment of the energy market in which it trades.  The company has also invested significant resources to develop comprehensive trading methods, strategies and techniques within the energy sector to maximize its investments.  The techniques and strategies have been refined over many years, and the success of trading in the present is critically dependent on the cumulative understanding it has developed over prior years.

13.     Among other job responsibilities, DC Energy's investment professionals examine underlying physical and economic factors within segments of the energy markets to identify investment and trading opportunities for the company.

14.     Individuals who are employed by DC Energy to invest and trade (as Mr. Miller was), become intimately knowledgeable regarding DC Energy's trading systems, methodologies, techniques, strategies and approaches, and have access, where and when appropriate, to DC Energy's exhaustive inventory of historical data and analysis regarding defined segments within the energy market.

15.     Unlike other trading firms which tend to functionalize roles, and drive employees to specialize, DC Energy exposes its investment professionals to all aspects of the business. For example, DC Energy's investment professionals, including Mr. Miller, (1) identify and maintain raw sources of market data; (2) build proprietary tools, or augment existing proprietary methods, to process, combine and display this data efficiently; (3) analyze market data to create valuations and identify profitable trading opportunities; (4) propose these trades and execute on them once approved by management; and (5) monitor the results and react to the outcomes to improve future trading decisions. DC Energy's entrepreneurial and innovative culture provides great opportunities for professional development and growth, and substantial financial rewards.

16.     A successful investment professional at DC Energy acts as though his or her portfolio is a line of business, and is responsible for all aspects of its strategy and operation. As new analysts are hired and trained, they are typically given specific responsibility for trading activity that has already been developed by other DC Energy professionals in prior years as these are more challenging trading strategies. This was the

case with Mr. Miller, and over the course of Mr. Miller's career, DC Energy trained him in several key trading areas.

17.     DC Energy's trading methodologies, techniques, strategies and approaches, and its inventory of historical data on energy markets, has significant economic value to DC Energy, and would be of significant economic value to competitors who trade in the energy commodity markets.

18.     To protect its legitimate business interests, including the investment it makes in training its employees, compiling information and mining sources for data used in its trading activities, DC Energy requires that employees who take part in DC Energy's trading business, sign agreements containing non-compete, non-solicitation and non-disclosure provisions as a condition of employment.

19.     Additionally, new DC Energy employees are given explicit instruction through a training course conducted by one of the company's managing directors regarding the treatment of confidential and proprietary information, policies which are reiterated in the company's employee handbook as well as risk management policies (which includes a separate annual training course). In all cases, the instructions are clear that almost all information at DC Energy should be treated as confidential and proprietary, that such information can only be stored or transferred electronically on DC Energy-provided devices or services, and that hard copies of materials must also be treated with care and securely disposed of when no longer needed. Access to the company's databases and documentation repositories, which store all of the company's information, is restricted to relevant segments for each individual depending on their role. All wired and wireless access to DC Energy's internal computer network requires a user-

6

specific password, and all access from outside the network requires a user-specific password and a second authentication factor that changes every thirty seconds.  All user laptops utilize full disk encryption to protect against theft, and all authorized handheld devices must be able to be remotely erased in the case of theft.

20.     Upon leaving DC Energy, departing employees are given a copy of their non-compete, non-solicitation and non-disclosure agreements as a reminder that they have agreed to certain obligations governing their post-engagement conduct and activities.

MR. MILLER'S EMPLOYMENT WITH DC ENERGY

21.     On or around August 8, 2007, DC Energy hired Mr. Miller to work as an analyst out of its Vienna, Virginia headquarters, with Mr. Miller beginning to work in early September of that year.  Prior to his employment with DC Energy, Mr. Miller had been a student at Brown University in Providence, Rhode Island and the Center for Arabic Study Abroad in Egypt, followed by one year of employment at HC Brokerage as an analyst within its research department with a focus on the Egyptian economy.  Thus, Mr. Miller came to DC Energy with no background, education, training or experience in the energy trading business.  His initial base salary was approximately $80,000 per annum.

22.     As with all DC Energy employees engaged in the energy trading business, Mr. Miller was required to sign a "Confidentiality, Non-Solicitation, and Non-Compete Agreement" as a condition to, and in consideration of, becoming employed by DC Energy.  Mr. Miller signed his Agreement on September 5, 2007.  A copy of the Agreement signed by Mr. Miller is attached as Exhibit A.

7

23.      Mr. Miller received on-the-job, apprenticeship-type training during his
first year of employment at significant cost to DC Energy.  During this time, Mr. Miller
was responsible for studying and learning about power markets, in particular, the New
York market known as the New York Independent System Operator ("NYISO").  Mr.
Miller engaged in extensive research in this market for the purpose of understanding and
valuing the constrained parts of the transmission grid, which involved analyzing
numerous factors including weather patterns, localized supply and demand, and the
impact and likelihood of outages and local energy infrastructure and development
activities.  Given the vast number of factors that one needs to consider to make an
appropriate valuation in just one part of the electrical grid (and this job required one to
look at all corners of the grid) it is not an activity that one can just pick up without first
developing an experience base.  Mr. Miller worked with experienced professionals to
accelerate the experiential learning process, and these professionals highlighted the key
areas of leverage and how to interpret certain observations.

24.      Over time, Mr. Miller became a congestion forecaster in the NYISO
market.  Mr. Miller's role here was central to DC Energy's success in valuing trades
profitability.  The congestion forecaster's output lies at the core of the investment thesis
as it is this valuation of the myriad factors at play and the resultant distribution of
possible outcomes that enables one to make a decision whether or not to buy or sell a
particular financial product and how much of it and for what price.

25.      As a congestion forecaster and trading professional, Mr. Miller was a
member of the NYISO trading team until on or around March 2010.  In June 2010, Mr.
Miller was assigned to a role on the OTC market team.  Mr. Miller was responsible for

OTC trading in not only the New York market, but also in the Midwest market (at the time, the Midwest Independent System Operator or "MISO," now called the Midcontinent Independent System Operator) and in the Texas market (Electric Reliability Council of Texas or "ERCOT").

26.     While the NYISO team was involved in the organized markets and the OTC team was involved in over the counter markets, on both teams Mr. Miller was required to identify and develop a potential trade and then submit the trade proposal for approval by the Management Committee.  His specific role on the OTC market team was a highly leveraged role.  Not only did he continue to have expert, detailed knowledge of DC Energy's specific trading in the NYISO market, his purview expanded to include a larger footprint of DC Energy's overall business by including MISO and ERCOT.  In this role, Mr. Miller had access to and intimate knowledge of all DC Energy's trading activities within these markets, to include: all FTR related trading, all "over the counter" trading in standard financial swaps, all futures contract trading and all non-standard derivatives negotiated with specific counterparties.  The aggregate of this trading in the NYISO, MISO and ERCOT markets contribute, in a typical year, up to half of all DC Energy trading revenue.

27.     Over the course of his employment, DC Energy repeatedly advanced Mr. Miller and assigned him greater trading and management responsibilities.  His accelerated compensation at DC Energy reflected this advancement.  During Mr. Miller's tenure at DC Energy, few employees rose through the ranks at DC Energy as quickly as Mr. Miller did.  In recognition of the success demonstrated by Mr. Miller as an investment professional, DC Energy promoted Mr. Miller to the title of "Principal" in or

about November 2012.  His compensation for the calendar year 2012, his last full year with DC Energy, exceeded $309,000.

28.      While at DC Energy, both as a forecaster and a higher management level employee, Mr. Miller gained an intimate and detailed knowledge of DC Energy's proprietary trading techniques, particularly with respect to OTC energy markets and the more specialized NYISO transmission congestion contracts market.  These trading techniques, which included complex valuation and pricing strategy algorithms, permit DC Energy to make valuations accurately and quickly, thereby giving the company an edge in the highly competitive trading business.

29.      DC Energy's trading techniques are developed and refined over many years through a significant investment in company employees and other business resources such as computer, research and data systems.  The effort required to develop successful trading methods is extensive and necessary in order to compete in the evolving and highly competitive energy trading business.

30.      Specifically, Mr. Miller had access to DC Energy's proprietary and confidential business information and trade secrets related to the energy trading business, including, but not limited to:

>    (a) sophisticated trading techniques, methods, and information including algorithms, strategies, trading strategies, analysis and research;

>    (b) sensitive financial and pricing information and policies related to trades and potential trades;

>    (c) extensive historical data on the unique and specialized OTC and NYISO markets compiled and mined by DC Energy;

(d) information about the company's products, innovations, technology, engineering, data systems, software and computer programs;

(e) the identities of current and potential counterparties and trading parties, and the terms of contracts and agreements with such entities; and

(f) information about the company's numerous affiliates and subsidiaries.

31.     The information referenced in Paragraphs 28 – 30 above is not otherwise obtainable from public sources and constitutes confidential and trade secret information. DC Energy expends substantial resources in keeping its techniques and information confidential as described in Paragraphs 18 – 20, and requires employees to sign confidentiality or non-disclosure agreements, such as the Agreement signed by Miller when he became employed.

32.     Mr. Miller had no knowledge of DC Energy's confidential information or trade secrets prior to his employment at DC Energy.

MR. MILLER'S RESTRICTIVE COVENANTS

33.     In his Agreement, Mr. Miller agreed not to disclose DC Energy's confidential information during and after the term of his employment. Specifically, in Paragraph 1B of the Agreement ("Duty Not to Disclose Confidential Information"), Mr. Miller agreed that:

> Except as required in the course of performing his employment duties and as authorized by the Employer, the Employee agrees that he will not directly or indirectly, during or after the term of his employment, disclose, reveal, or use any Confidential Information…

34.     In the Agreement, the parties acknowledged that DC Energy is engaged in "…the business of trading energy, including but not limited to, the buying and selling of future and spot electricity, future and spot electricity derivatives including transmission

11

rights, and the buying and selling of future natural gas," which is defined by the

Agreement as the "Energy Trading Business."

35.     Mr. Miller also agreed not to engage in the "Energy Trading Business" for

a period of two years following the termination of his employment with DC Energy,

thereby prohibiting him from doing energy trading in competition with DC Energy.

Specifically, Sub-parts A and B of Paragraph 5 ("Non-Competition After Employment")

of the Agreement provide that:

A.  **Acknowledgements**.  The Employee acknowledges that the Confidential
Information the Employee receives or learns of regarding the Employer's
Energy Trading Business is special and unique, and that the use or disclosure
of that Confidential Information would be immediately and irreparably
damaging to the Employer.  The Employee further acknowledges that such
Confidential Information and the methodologies used by the Employer in its
Energy Trading Business could be used anywhere in the world in which
energy is traded, and that absent the restraint contained in paragraph B below
the Employee could effectively transfer to his own use and benefit the
knowledge, experience and Confidential Information obtained while in the
Employer's employ, all to the Employer's competitive harm.  Accordingly,
the Employee expressly agrees that the non-competition covenant set forth in
Paragraph B below is reasonable and appropriate to protect the Employer's
legitimate business interests.  The Employee further acknowledges that he has
substantial expertise and skills that can be applied in businesses other than the
Energy Trading Business and that the Employee's agreement not to engage in
the Energy Trading business for a period of time following his or her
employment with the Employer will not impose an unreasonable restraint or
limitation on the Employee's ability to earn a living.

B.  **Restriction on Competition in Energy Trading Business Following
Termination of Employment**.  For the two year period immediately
following the termination of Employee's employment with the Employer,
regardless of the circumstances and reasons for such termination, the
Employee shall not whether as an owner, partner, employee, consultant,
independent contractor, or in any other manner, directly or indirectly, engage
in the Energy Trading Business without the prior written consent of the
Employer, which consent may be granted or withheld in Employer's sole
discretion.

## MR. MILLER'S DEPARTURE

36.       In late 2012, DC Energy made some changes to its agreement forms, largely due to changes in the regulatory environment, including DC Energy becoming directly subject to regulations by the U.S. Commodity Futures Trading Commission ("CFTC"). The company required all of its employees to sign the revised agreements as a condition of their continued employment, and in exchange for which they would be paid a special bonus.

37.       On or about December 11, 2012, DC Energy requested that Mr. Miller sign the new confidentiality, non-compete and non-solicitation agreements as it did for all similarly situated employees, and offered Mr. Miller a special bonus of ten-thousand dollars ($10,000) for doing so.

38.       Mr. Miller refused to sign the new form of agreement, unless DC Energy offered him significantly more money. DC Energy declined to do so.

39.       Soon thereafter, on January 31, 2013, Mr. Miller left DC Energy. Mr. Miller told colleagues at DC Energy that he would seek to go to business school.

## MR. MILLER'S POST-DEPARTURE CONDUCT

40.       Initially, as far as DC Energy knew, Mr. Miller had not entered the energy trading business. On or about October 28, 2013, DC Energy director Mark Bulkeley heard from a third-party broker that Mr. Miller had joined Saracen Energy ("Saracen") based in Houston, Texas. Around the same time, at an October 28, 2013 trade conference and on a November 4, 2013 telephone call, Saracen's President, Kevin Kelley, acknowledged to DC Energy Managing Director Andrew Stevens that Saracen had hired Mr. Miller. Mr. Kelley also told Mr. Stevens that Saracen's practice was to hire established energy market experts in order to build a deeper bench. Mr. Kelley explained

13

that while Saracen had had a broader market focus, such as natural gas, oil and other commodities, the company had decided to narrow its focus to power and its related transmission congestion products, an area where DC Energy is a recognized market leader. While Saracen has had a strong historical track record in transmission congestion products in some markets, it has had no recent experience in NYISO. Saracen is also new to the OTC market, again a market in which DC Energy is a leading market participant.

41.     Upon information and belief, Saracen hired Mr. Miller in or about July 2013 to work from its Houston, Texas office.

42.     Saracen is a direct competitor of DC Energy within the energy trading business. According to its website, Saracen Energy is "engaged in physical financial trading in the North American energy commodity markets…Saracen executes diversified strategies in multiple energy markets: electric power, natural gas, crude oil and refined products; coal and emissions."

43.     In the several years prior to employing Mr. Miller, Saracen had no material presence trading energy for the New York market either "over the counter" or in the organized NYISO market. It put Mr. Miller to work in those markets because of the knowledge and expertise he had learned and developed while at DC Energy, and through Mr. Miller, Saracen became increasingly involved in trading in the New York markets, both in NYISO and over the counter markets. Shortly after employing Mr. Miller, Saracen established a position in the NYISO transmission congestion contracts market in October 2013 for the first time since 2008, and it has been growing its position there ever since.

44.      In just the last two months of 2013, Saracen's TCC positions in NYISO

had an approximate net return of $1.2 million. Most tellingly, the selection of TCCs by

Saracen was dramatically different from its selection when it was active in 2008 and

before. This selection process involves choosing two locations in the electrical grid, one

as the source (or supply) of electricity and one as the sink (or demand) of electricity.

These locations can be specific power generators, which can also be referred to as

"nodes," or they can be aggregated regions comprising many locations, which are known

as "zones" or "hubs." Most FTR or TCC traders choose hubs or zones out of simplicity.

However, if one can choose specific nodes, the value can be much greater. DC Energy

makes extensive use of nodes in its portfolios. In the period from 2008 and earlier,

Saracen used mostly zones. Beginning in the fourth quarter of 2013, after it had put Mr.

Miller to work in these markets, Saracen made extensive use of nodes, similar to DC

Energy. Even more tellingly, Saracen's exact selections of sources and sinks has had a

70% overlap with DC Energy's selections. In the prior period that Saracen was in these

markets without Mr. Miller, this overlap was less than 10%.

45.      Saracen also entered the Long Island congestion contracts markets for the

first time as a result of Mr. Miller's background and experience with these markets while

at DC Energy. Through systematic and detailed investigation as to the cause and effect

of transmission and generation events affecting Long Island, much of this conducted by

Mr. Miller himself, DC Energy had emerged as the only consistently profitable trader in

the congestion markets on Long Island. Saracen had no meaningful presence in the Long

Island congestion markets until after August 2013. Since that date, with Mr. Miller

working for Saracen and using the knowledge, experience and information he had learned

while at DC Energy, Saracen has emerged as a leading competitor in these specialized markets. In the months of November and December, 2013, Saracen's competitive trading relating to Long Island netted over one million dollars ($1,000,000), and has likely reduced DC Energy's profitability over the same period by a similar amount.

46.     Upon information and belief, Mr. Miller has willfully used DC Energy's confidential and proprietary information, including its trading techniques and strategies, with the intent to harm DC Energy, in furtherance of Saracen's business, such as establishing Saracen's position in the specialized NYISO and Long Island congestion markets, as well as the over the counter markets. Mr. Miller's activities for Saracen are in direct competition with DC Energy and are prohibited by his Agreement with DC Energy.

47.     Mr. Miller's actions have caused and, unless enjoined, will continue to cause DC Energy irreparable damage in excess of $75,000, exclusive of interest and costs. In addition, the value of the rights DC Energy seeks to protect has a value far in excess of $75,000, exclusive of interest and costs.

## COUNT ONE

### (Breach of Contract)

48.     Paragraphs 1 through 47 are incorporated herein as if fully re-stated.

49.     On September 5, 2007, Mr. Miller accepted the terms of the lawful and enforceable Agreement with DCE Holdings.

50.     By agreeing to the terms of the Agreement, Mr. Miller agreed that during and after his term of employment he would not disclose, reveal or use any of DC Energy's confidential information.

16

51.     Mr. Miller also agreed not to engage in the Energy Trading Business as defined in the Agreement for a period of two years following the termination of his employment with DC Energy without the company's prior written consent.

52.     Mr. Miller has engaged in the Energy Trading Business for Saracen within two years of leaving DC Energy without DC Energy's prior written consent in violation of Section 5 of the Agreement.

53.     In addition, Mr. Miller has used, disclosed and relied upon DC Energy's confidential business information and trade secrets in his new position at Saracen in breach of Section 1 of the Agreement.

54.     DC Energy has been damaged and will continue to be damaged as a result of Mr. Miller's breaches of contract.

### COUNT TWO

### (Misappropriation of Trade Secrets)

55.     Paragraphs 1 through 54 are incorporated herein as if fully re-stated.

56.     DC Energy's proprietary and confidential information, including but not limited to its trading techniques, methods, and strategies, are trade secrets within the meaning of Va. Code. Ann. § 59.1-336 (2011) ("the Virginia Uniform Trade Secrets Act").

57.     DC Energy's confidential information and trade secrets, including, but not limited to its trading techniques, strategies and compilation of historical data, have actual independent economic value because they are not generally known or readily ascertainable, and are of significant value if disclosed to or relied upon by a third party, such as Mr. Miller or Saracen.

58.     DC Energy took adequate measures to protect its trade secrets, including limiting access to such trade secrets to select employees and otherwise restricting access, and requiring employees to sign non-compete, non-solicitation and confidentiality or non-disclosure agreements.

59.     Mr. Miller has willfully misappropriated and knowingly utilized DC Energy's trade secrets, including, but not limited to its proprietary trading techniques and strategies as described above, with the intent to further the business of his new employer Saracen, and with the malicious intent to harm DC Energy, all in violation of the Virginia Uniform Trade Secrets Act.

60.     As a result of Mr. Miller's conduct, DC Energy has suffered and will continue to suffer substantial damages.  Pursuant to Sections 59.1-337, -338, and -338.1 of the Virginia Uniform Trade Secrets Act, DC Energy is entitled to an injunction enjoining Mr. Miller from continuing to misappropriate DC Energy's trade secrets, as well as an award of compensatory and punitive damages, and attorneys' fees.

### PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court to enter a judgment against Mr. Miller and in favor of Plaintiffs on all Counts of this Complaint, including specifically the following relief:

1.     Enter preliminary and permanent injunctive relief prohibiting Mr. Miller from breaching the obligations in his Agreement, including, but not limited to, the non-disclosure and non-compete provisions and from continuing misappropriations of DC Energy's trade secrets in violation of the Virginia Uniform Trade Secrets Act;

2.      Award Plaintiffs actual and compensatory damages on all Counts in an amount of to be proven at trial, which Plaintiffs currently believe is in excess of one-million dollars ($1,000,000).

3.      Award Plaintiffs punitive damages on all Counts in an amount to be proven at trial as a result of Mr. Miller's willful and malicious misappropriation of trade secrets under § 59.1-338(B) of the Virginia Uniform Trade Secrets Act;

4.      Award Plaintiffs reasonable attorneys' fees and other costs Plaintiffs have incurred in bringing this action pursuant to § 59.1-338.1 of the Virginia Uniform Trade Secrets Act as a result of Mr. Miller's willful and malicious misappropriation of trade secrets; and

5.      Award such other and further relief as the Court may deem just and proper.

Respectfully submitted,

David Barmak
Virginia Bar No. 15853
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.,
701 Pennsylvania Avenue, NW
Suite 900
Washington, DC 20004
Email: DBarmak@mintz.com
Telephone: (202) 434-7300
Facsimile: (202) 434-7400

*Attorney for Plaintiffs*

Of Counsel:

Matthew Cohen
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.,
701 Pennsylvania Avenue, NW
Suite 900
Washington, DC 20004
Email: MCohen@mintz.com
Telephone: (202) 434-7348
Facsimile: (202) 434-7400

Dated:  January 7, 2014